Appeal of **BROWNSVILLE & MATA-MOROS BRIDGE CO.**                    Docket No. 93.

1. The motion of the Commissioner to dismiss the petition for lack of jurisdiction in this Board to hear and determine appeals from deficiencies arising out of the application of the provisions of section 210 of the Revenue Act of 1917, is denied in accordance with the decision and opinion in the *Appeal of Oesterlein Machine Company*, 1 B. T. A. 159.

2. Where the taxpayer is able to adduce proof of the value of its properties, tangible and intangible, for purposes of invested capital, the Commissioner is not authorized to compute the tax, over the protest of the taxpayer, under the provisions of section 210 of the Revenue Act of 1917.

3. Taxpayer in this appeal has proved the value of its properties, tangible and intangible, for purposes of invested capital.

Submitted November 17, 1924; decided January 13, 1925.

*J. L. Lockett, Esq.*, for the taxpayer.

*R. A. Littleton, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

This is an appeal from an additional profits tax proposed to be assessed by the Commissioner for the calendar year 1917.

### FINDINGS OF FACT.

1. The taxpayer is an Arizona corporation, with its principal office in Houston, Tex., and is engaged in the business of the maintenance and operation of an international bridge across the Rio Grande between the city of Brownsville, Tex., and the city of Matamoros, Mexico, and also a ferry at the same point.

2. In 1881 there was organized under the laws of the State of New York a corporation known as the Brownsville Ferry Co., with a capital stock of $100,000 which was paid in. Immediately thereafter this company used this $100,000 in the acquisition of about 110 acres of land on the river front at Brownsville, Tex., controlling all of the river frontage available for communication to Mexico. With the same money it also acquired the equipment of a private company, not concerned with the organization of this corporation, which had theretofore been operating a ferry at that place. The Brownsville Ferry Co. continued in business until it was taken over by the taxpayer corporation in 1911.

3. In 1909 the taxpayer corporation, Brownsville & Matamoros Bridge Co., was organized. The corporation issued $500,000 of its capital stock for the acquisition of certain valuable franchise rights which may be generally summarized as the right to construct a bridge across the Rio Grande between Brownsville, Tex., and Matamoros, Mexico, and franchises and rights of way over the streets of the cities of Brownsville and Matamoros, with the Mexican franchises necessary for the construction of the bridge on the Mexican side. These rights and franchises were acquired by outside parties and purchased from such parties by this taxpayer with an issue of $500,000 of its capital stock.

4. In 1911 the taxpayer issued an additional $150,000 of its capital stock and also $93,000 of bonds and with such stock and bonds it acquired from the Brownsville Ferry Co., the entire capital stock of that company, together with all its assets, including lands, ferry boats, landings, houses, equipment, and rights of every nature.

5. The parties from whom the taxpayer acquired the franchises and rights referred to in paragraph 3 above disposed of the capital stock of the taxpayer, received by them in that transaction, in the amount of $500,000, in such manner as to evidence the fact that such stock was worth its par value of $500,000 and it is so found here. (See Interstate Commerce Commission Report No. 5393 with schedules and exhibits.)

6. There is no dispute in this appeal as to the value of the tangible property acquired by the taxpayer from the Brownsville Ferry Co., referred to in paragraph 4 above. The value of such tangibles is found to be $146,957.35 less a bonded indebtedness of $93,000, equaling $53,957.35. This last-named valuation is found to be the proper valuation of the taxpayer's tangible property for invested capital purposes in the taxable year under consideration.

61359°—26——21

7. The Board finds upon the evidence that the total capital stock of the taxpayer corporation outstanding on January 1, 1917, was $650,000 par value. Under the provisions of section 207 of the Revenue Act of 1917, limiting to 20 per cent of the capital stock outstanding the amount which may be allowed for the value of intangibles to be included in invested capital as a basis for the computation of excess profits tax, the Board finds that the amount properly allowable as the value of the intangibles here being considered is $130,000; and that the amount of invested capital of the Brownsville & Matamoros Bridge Co. to be allowed as a basis for computing excess profits tax upon the consolidated return for the year 1917 is the sum of $53,957.35 (tangibles) plus $130,000 (intangibles), aggregating the total sum of $183,957.35.

8. On audit of taxpayer's return the Commissioner computed the profits tax of this taxpayer in accordance with the provisions of section 210 of the Revenue Act of 1917 on the ground that the Secretary of the Treasury was unable satisfactorily to determine the invested capital of this taxpayer. As a result of such computation the Commissioner determined a deficiency in tax for the year 1917, and on July 11, 1924, notified the taxpayer by registered letter of the additional tax proposed to be assessed against it. On August 30, 1924, the taxpayer initiated its appeal by the filing of a petition with this Board.

9. The taxpayer made no application for assessment pursuant to section 210 of the Revenue Act of 1917. The net income for the year 1917 of the Brownsville & Matamoros Bridge Co. was $11,245.95 and of the Brownsville Ferry Co. $10,251.14, making a consolidated net income for excess profits tax purposes of $21,497.09.

#### DECISION.

The deficiency should be computed in accordance with the following opinion. Final decision of the Board will be settled on consent or on fifteen days' notice, in accordance with Rule 50.

#### OPINION.

KORNER: To the taxpayer's petition in this appeal filed, the Commissioner interposed a plea to the jurisdiction of this Board, which plea is here considered as a motion to dismiss. The basis of the Commissioner's motion is that the determination of the deficiency was made pursuant to discretionary authority lodged in the Commissioner in respect of assessments made pursuant to the provisions of section 210 of the Revenue Act of 1917 and that such determination made pursuant to such authority is not reviewable by this Board or by any other tribunal. This motion of the Commissioner to dismiss is denied in accordance with the opinion in the *Appeal of Oesterlein Machine Company*, 1 B. T. A. 159.

The issue in this appeal is one of fact. The Commissioner computed the tax under section 210 of the Revenue Act of 1917 because of the alleged inability of the Secretary of the Treasury satisfactorily to determine the invested capital of the taxpayer. It is con-

ceded by the Commissioner that if such invested capital can be proved by the taxpayer, the tax should not be computed under the special assessment provision. The value of taxpayer's *tangible* property for purposes of invested capital is not in dispute. It is agreed by both parties that such value is $53,957.35.

The issue is thus narrowed to the question what was the value of the taxpayer's *intangibles* for purposes of invested capital at January 1, 1917. The Commissioner contended that its value was speculative due to the unsettled conditions in the Republic of Mexico rendering such values uncertain and not susceptible of satisfactory determination. For that reason the Treasury Department declined to determine any value and computed the tax as stated above.

While it may be admitted that the determination of such values is at times fraught with administrative difficulties yet in our opinion this is not a complete answer to the problem. At the hearing of this appeal the taxpayer frankly conceded that such difficulties did exist. But at the same time it came forward with evidence of a character and weight which was persuasive and, to our minds, satisfactory and convincing on this issue.

It appears from the evidence introduced that the capital stock of this company was of a value equal or approximately equal to its par value of $650,000. The franchise rights in question were originally acquired by the Brownsville & Gulf Railway Co. and the National Railways of Mexico. Each of these companies transferred its rights to the taxpayer in consideration of 2,500 shares (par value $100) of the taxpayer's capital stock. The evidence shows that in May, 1910, 2,497 shares of the taxpayer's capital stock (being all of the 2,500 shares first above referred to except directors' qualifying shares) were acquired by the St. Louis, Brownsville & Mexico Railway from the St. Louis Union Trust Co. for $249,700 of St. Louis, Brownsville & Mexico Railway Co.'s first mortgage 6 per cent bonds, dated December 1, 1909. At that time there were issued and outstanding $10,256,000 of St. Louis, Brownsville & Mexico Railways first mortgage 6 per cent bonds and the consideration for these bonds included the 2,497 shares of taxpayer's capital stock listed at $249,700.

These bonds, together with $500,000 of the capital stock of the railway company and other securities having a par value of $455,450, aggregating in all $11,211,450, were, under an agreement between the St. Louis Union & Trust Co. (syndicate manager) and the St. Louis & San Francisco Railroad Co., sold to the St. Louis & San Francisco Railroad Co. for the sum of $11,827,200, with accrued interest from December 1, 1909; this agreement was dated December 1, 1909, and was consummated, and payment in the sum of $12,122,897.72 was made by the St. Louis & San Francisco Railroad Co. to the syndicate on May 26, 1910. (These data are verified by the findings and report of the Interstate Commerce Commission, Docket No. 5933, 29 I. C. C. 169, with notes, schedules and exhibits.)

This would seem to establish that in the acquisition of the capital stock of the Brownsville & Matamoros Bridge Co., the St. Louis, Brownsville & Mexico Railway Co. paid in fact approximately par for that stock, for the reason that, in payment for the bridge company stock, said railway company delivered to the St. Louis Union

& Trust Co. (syndicate manager) an equivalent amount of par value of said railway company's bonds, and these securities of the St. Louis, Brownsville & Mexico Railway Co., when acquired by the St. Louis & San Francisco Railroad Co. from the syndicate manager under practically contemporaneous transactions, brought above par. It also goes to show that the franchise rights of the Brownsville & Matamoros Bridge Co. acquired from the Brownsville & Gulf Railway Co. had a cash value at least equal to the par value of the capital stock of the bridge company issued in consideration for such assignment, because the bonds of the railway company (which were delivered to the syndicate in exchange for the bridge company stock), when purchased by the St. Louis & San Francisco Railroad Co. from the syndicate manager, brought approximately par.

This would show the value of intangible assets (to be included in the compilation of invested capital of the Brownsville & Matamoros Bridge Co.) to be not less than $250,000 (leaving out of consideration any intangibles acquired for the $250,000 stock issued to the National Railways of Mexico); but, inasmuch as the total capital stock of the bridge company issued prior to and outstanding on March 3, 1917, was $650,000, the value of the intangibles which may be included in invested capital for the purpose of determining the 1917 excess profits tax, is limited by the terms of section 207 of the Revenue Act of 1917 to $130,000 (20 per cent of $650,000); this sum, $130,000, is the maximum amount allowable for invested capital purposes.

But there are other cogent factors entering into the equation of values of these intangibles. In addition to the fact of a consolidated net income for 1917 of $21,497.09 there are elements of value brought to our attention by the testimony of witnesses whose knowledge of, and familiarity with, conditions surrounding this taxpayer over a long period of years, entitle their opinions to respect. Among these elements are:

(1) In locating the international bridge across the Rio Grande between the city of Brownsville, Tex., and Matamoros, Mexico, it was necessary to select a crossing that would as nearly as possible be free from the effects of future changes in the channel of the Rio Grande. This river is notorious for its meanders and many channel changes. The present location of the bridge was selected on a portion of the channel which is straight. It appears from the evidence that there has been no trouble at the crossing, while both above and below the bridge private interests on the one hand and the city of Brownsville, Tex., on the other, have spent thousands of dollars protecting their property from erosion. There is an inherent intangible value due to the location of the bridge at its present site that can be measured by what has occurred above and below it. The city of Brownsville, Tex., in addition to losing valuable property, has within the past few years spent not less than $30,000 protecting valuable land from encroachments of this river.

(2) The Brownsville & Matamoros Bridge Co. controls, through the ownership of the Brownsville Ferry Co., a strip of land fronting on the Rio Grande commencing in the heart of the city of Brownsville, Tex., and extending up the river for 2 miles. The ownership of

this property enables this carrier to enjoy communication with the Republic of Mexico unmolested and without competition. Witness testified that it would be impossible through the expenditure of any reasonable sum of money to acquire rights as valuable as those enjoyed by this company by reason of its control or ownership of the land along the entire river front. This strip of land lies between the city of Brownsville, Tex., and the Rio Grande; the city of Matamoros, Mexico, is located directly opposite, or in such a way as to cause all commercial intercourse between the United States of America and the Republic of Mexico in that vicinity to be carried on across or upon this property which is owned or controlled by this company. All the land on the American side of the river at Brownsville, Tex., usable for ferry or bridge service is owned or controlled by the Brownsville & Matamoros Bridge Co.

(3) As heretofore stated, the franchises on the Mexican side were originally secured by the National Railways of Mexico and assigned by it to the taxpayer for 2,500 shares of its capital stock, par value of each share $100. These franchises include the right to cross and occupy streets in the city of Matamoros, together with the right to use the yards, station grounds and lands of the National Railways of Mexico. Such rights can not be said to be without considerable value. The witnesses have placed values thereon which do not appear to us to be excessive.

(4) It appears from the evidence that the line of the Brownsville & Matamoros Bridge Co. through the location of the international bridge upon its present site makes connection of the American to the Mexican side of the Rio Grande without the necessity of constructing any circuitous loops or curves so detrimental to operation, placing the two countries in direct connection with each other by rail in the shortest possible distance without any steep grades or other operating difficulties. At the same time it makes possible the crossing of the Rio Grande at right angles, which was necessary in bridging a river of the character of the Rio Grande.

(5) The intangible value of the bridge as a link in the international communication between the Republic of Mexico and the United States.

While we realize that it is difficult to assign a definite value to each of such elements, yet witnesses, whose qualifications as experts to testify in this point were satisfactorily established, testified that the property of this taxpayer had an intangible value of not less than $275.000. The Commissioner offered no evidence in the premises. We are constrained to hold that the taxpayer has established at least a *prima facie* case as to the values claimed by it. Accordingly we decide that the value of this taxpayer's property for purposes of invested capital on January 1, 1917, was the sum of $53,957.35 (tangibles) plus $130,000 (intangibles), aggregating the total sum of $183,957.35. The value of the intangibles is fixed at $130,000 because of the limitation imposed by section 207 of the Revenue Act of 1917, prescribing such value at not more than 20 per cent of the par value of the total shares of the capital stock of the taxpayer.